**SHAW et al. v. MOODY et al.   (No. 8687.)**

(Court of Civil Appeals of Texas.   Galveston. June 11, 1925.)

Adverse possession ⬩65(½)—Possession of land for statutory period by permission and authority of one erroneously believing such land was his held to ripen into title for benefit of his estate.

Where a person and his successors held continuous peaceable possession for 10 years of land, under authority of, and as tenant of, one who erroneously believed the land was his, such use and occupancy *held* an assertion of dominion over and ownership of the land as ripened into title for benefit of estate of such person as against the record owner, in view of Rev. St. art. 5675.

Appeal from District Court, Galveston County; Robert G. Street, Judge.

Action between C. T. and W. A. Shaw, executors of the estate of N. W. Shaw, deceased, and W. L. Moody, Jr., and Sealy Hutchings, executors of the estate of W. L. Moody, deceased, and others. From an adverse judgment, executors of the Shaw estate appeal. Affirmed.

Lockhart, Hughes, Lockhart & Rayzor, of Galveston, for appellants.

C. W. Nugent, of Galveston, for appellees.

GRAVES, J.   This suit involved the title to 39 feet 10 inches of the west side of lot 6, and 8 inches of the east side of lot No. 5, comprising a small rectangular body of land lying in outlot No. 60 in the city of Galveston.   At the trial it was agreed between the parties that appellants had the record title and were entitled to recover, unless the appellees should prevail under their plea of adverse possession and 10 years' limitation.

The court below heard the cause without a jury, and rendered judgment in favor of the appellees; their antagonists present this appeal.

The material facts are brief and undisputed, being these: In 1912 J. B. Bisbey, under permission from Col. W. L. Moody to use and occupy his property at Avenue 0½ and Thirty-Eighth street, which privilege and occupancy he acknowledged in a letter dated September 24th of that year, fenced along with Col. Moody's tract, the two being adjoining, the land here in controversy, and used it as a pasture for his stock up to the time of his death in 1914, keeping the fences up and holding the property for Col. Moody. Herbert Bisbey, his son, then succeeded him in possession, in like manner using the land for a time as pasturage for his horses, keeping up the fences his father had built while he had it, and, after disposing of his stock, turning the property over to Mr. Rattiseau for his use.   On the retirement of Herbert Bisbey, Mr. Rattiseau (as he said under permission from Miss Louise Bisbey, a daughter of J. B. Bisbey, the date of which he fixed at a week or two after the latter's death) began using the land as a pasture for his cow, and continuously so used it from then on up to the date of this trial in April of 1924, keeping up the fences as originally built thereon by J. B. Bisbey all the while.   J. L. Boddeker, who represented Col. Moody in all land matters from before 1912 up to his death, and then his estate up to the date of this trial, went out and looked the property over after Mr. Rattiseau had taken possession following the elder Bisbey's death; the exact date not appearing but apparently being only a few days or weeks after Mr. Rattiseau began his tenancy, telling the latter at the time that he was acting for the Moodys, directing him to keep the fences up, and telling him he could continue so using the property if he did so.   Mr. Rattiseau used the land as so fenced continuously and exclusively up to the time of this trial, and neither he nor Herbert Bisbey knew of any claim to it by the Shaws, or any one other than W. L. Moody, Sr.

Mr. Boddeker testified, in so far as is material, as follows:

"I was well acquainted with Col. W. L. Moody in his lifetime.   I represented him as his

agent in all land matters since about 1898. I am acquainted with the land in controversy in this suit. I was representing Col. Moody in land matters in 1912 and prior to that time. I was well acquainted with J. B. Bisbey. I have talked to Mr. Bisbey right on the property when he was using it, had his horses in there. Mr. Bisbey held this land for W. L. Moody, Sr. I don't remember the year that J. B. Bisbey died. I know Mr. Rattisseau who has just testified. He followed up Mr. Bisbey and held this land for W. L. Moody, Sr. The possession and use of that property by Mr. Bisbey and his family and by Mr. Rattisseau has been continuous up to now. I know that the fences about this property were kept up and in repair continuously since 1912. I looked after that to see that they were kept up. I know that Col. W. L. Moody claimed that land in controversy. He told me that was his land that was inclosed. He would ask if I was looking after the fences out there, and would inquire right along to see if the fences were kept up; and he continued to claim that land as his up to the time of his death. I was looking after it up to the time of his death and ever since he died for the Moody interests. Mr. Rattisseau recognized me as the agent of Col. Moody in looking after this property. Mr. Rattisseau held the property for W. L. Moody up to the time of Mr. Moody's death, and for his estate since then. The property has been used for a pasture since 1912, to pasture horses and cows, and that use has been continuous since that time.

"I have talked to Col. Moody about this lease he made to Mr. Bisbey. He had expressed to me that he had leased his land out there to Bisbey and for me to let Bisbey use the land. He never did tell me he had leased any of Mr. Shaw's land. He did not tell me he was claiming any of Mr. Shaw's land. He never did tell me to put Mr. Bisbey on any of Mr. Shaw's land. He didn't ever lead me to believe he was intending to claim any of Mr. Shaw's land. I didn't know Mr. Shaw was in it; didn't know that Shaw was in it until I came here this morning. He did claim this particular land in controversy—this land inclosed in the fence. He says, 'I want you to see that fence is kept up; that is my land, and I want the fences kept in good repair.' The fences were kept in good repair. The tenants kept them in good repair. Mr. Moody did not build any fence around that land. Mr. Moody personally did not make any improvements out there on that land, and never did use it personally."

Appellants so ably argue that the evidence fails to show any privity between W. L. Moody, Sr., and those who thus entered upon and occupied this land, in that it is shown that he only authorized the elder Bisbey to go upon his land—not that belonging at the time to Shaw—and did not know of or empower Bisbey to enter upon and occupy the land of another, that at first blush we were reluctant to hold otherwise, but, after carefully considering the evidence in all its phases, we have reached the conclusion that it is at least susceptible of another construction, and that, in deference to the judgment of the learned trial court, it should be held

to have been so viewed there—that is, there being no evidence that W. L. Moody knew where his own lines were, or that the land as actually fenced by Mr. Bisbey under the authority he had given him was in fact not his own but was inclusive of so much of M. W. Shaw's land as is here involved, the question of privity between him and the successive tenants who entered and held pursuant to this grant to Bisbey, or between the tenants themselves, does not arise, under these further uncontroverted facts: That Bisbey in 1912 entered upon, fenced, and appropriated this particular land as the agent and tenant of W. L. Moody; that Moody continuously thereafter until his death treated him as such in relation to it, and that Bisbey and members of his family up to the time the property was turned over by them to Mr. Rattiseau recognized Moody as their landlord, all the while appropriating under fences and using this land as his tenants and agents, they in turn being immediately followed up in like appropriation, use, and occupancy by Mr. Rattiseau who so continued uninterruptedly as the agent and tenant of W. L. Moody and his successors in title up to the filing of this suit on February 27, 1924; and finally that J. L. Boddeker, the plenary agent of Moody, with full knowledge of all the facts recited, consented to and approved in behalf of his principal such appropriation, occupancy, and use of the property throughout the period of at least 10 years next before the filing of this action.

In other words, we think that this unquestioned state of the proof authorized, indeed required, the court below to hold that these successive agents and tenants held this particular land for W. L. Moody and his successors in interest under such continuous physical appropriation and adverse possession of it in their behalf from September, 1912, to February, 1924, as to comply with all the requirements of the 10-year statute of limitation and give them title thereunder.

In such circumstances the knowledge of Mr. Boddeker, by implication at any rate, was that of Mr. Moody and his successors, and the situation thus presented without dispute as to the facts amounted in law, not only to such peaceable and adverse possession under use, occupancy, and enjoyment as R. S. art. 5675, requires, but also to an assertion of dominion over and ownership of this land for more than 10 years. That being true, a title was fully made out by the appellees, and it was not further incumbent upon them to show whether or not W. L. Moody knew that his tenants had appropriated and were so using land, the record title to which stood in another.

The citation of authorities is deemed unnecessary; the judgment has been affirmed.

Affirmed.